**LEPOW**

v.

**DIMOND LEATHER CO., Inc.**

**Civ. A. No. 51–149.**

United States District Court
D. Massachusetts.

Dec. 30, 1953.

Gerald T. O'Hara, H. Brooks Beck, Hill, Barlow, Goodale & Wiswall, Boston, Mass., for plaintiff.

Thomas H. Mahony, Alan J. Dimond, Boston, Mass., for defendant.

FORD, District Judge.

This action arises out of an alleged breach by defendant of a contract be-

5. Campbell's Estate v. Kavanagh, D.C.Mich., 114 F.Supp. 780.

tween the parties for the financing of certain shipments of skins which were being imported from India and Pakistan.

Defendant corporation has for many years been engaged in the leather business, and since 1939 has devoted itself entirely to the importation of hides and skins. Its purchases in 1949 included shipments of goatskins from Anciens Etablissements Blumenthal, Calcutta, India, South Indian Export Co., Ltd., Madras, India, and Western India Skin Exporters, Karachi, Pakistan. These are the three shipments involved in the present action.

Early in July of 1949, Isaac Dimond, president of defendant, was introduced in New York to plaintiff, a New York resident, who had also been engaged for many years in the business of importing and exporting hides and skins. As a result of their conversations they entered into an arrangement whereby plaintiff was to finance these shipments to defendant, which was confirmed by a letter of Dimond to plaintiff on July 20. This arrangement may be summarized as follows: Plaintiff was to furnish funds to pay for the skins by opening letters of credit in British sterling in favor of defendant's shippers. These shippers were to ship the skins to ports in East Africa, consigned to agents of plaintiff, who, on receipt of the skins, would transship them to New York consigned to defendant. Defendant agreed that upon presentation by plaintiff of bills of lading showing such shipment of the skins to defendant in New York, it would pay plaintiff for the sterling advanced by plaintiff to the shippers at a rate not less than $3.40 nor more than $3.48 per British pound sterling, dependent upon exchange rates in New York in effect at the time of the shipment. If the plans had been carried out successfully defendant would have profited by being able to acquire the sterling to pay his shippers at not more than $3.48 per pound, at a time when the New York exchange rate was about $4.02. Plaintiff could purchase the sterling from his correspondent abroad at $3.22

and would profit by the difference between this figure and the price at which defendant would reimburse him.

In accordance with defendant's instructions plaintiff caused a letter of credit to be opened in favor of Western India Skin Exporters in the amount of £7,500, and by means of telegraphic transfers caused £7,450 to be forwarded to South Indian Export Co. Ltd., and £7,300 to the Blumenthal firm. Telegraphic transfers were used in the latter two cases at the request of defendant, who represented that these shippers wanted payment to be made in that manner. In letter of August 8, 1949, confirming these instructions, Dimond stated: "This is to confirm that we assume the responsibility for your cabling the Sterling out to the shippers; that the shippers, in turn, will deliver the Goatskins covered by their contracts with us."

The opening of the letter of credit and the making of the telegraphic transfers was actually done by plaintiff's correspondent, one Binjamin Israelachvili, of Milan, Italy. The sterling supplied was, therefore, sterling owned by Israelachvili, an Italian resident. In accordance with plaintiff's instructions, the shipments of the skins were to be made on American vessels consigned to plaintiff's agents in Djibouti, French Somali Coast, the destination to be given as "Djibouti in transit".

Defendant's shippers did not ship the skins after these funds had been made available to them by plaintiff, on the ground that under the applicable exchange control regulations then in force in India and Pakistan sterling owned by an Italian resident was not available for use in payment of exports either to Djibouti in transit or to an ultimate destination in the United States. Plaintiff was informed of this fact by defendant, notice of the difficulties encountered by the South Indian Export Co., Ltd., at least, being given as early as by Dimond's August 25 letter to plaintiff. There appears to have been some delay in the receipt of the transfer made to the

Blumenthal firm, but it was finally received in September after defendant had arranged for payment by other means. Defendant had at first suggested that the funds when received by Blumenthal should be retained to cover future purchases of skins by defendant. However, by September 19, Dimond, by letter, informed plaintiff that Blumenthal had met with similar refusal by the Indian authorities to allow Blumenthal to use the funds in payment for the shipments in question.

Meanwhile defendant had arranged to pay for the skins by opening letters of credit in favor of its shippers with American bankers, utilizing American-owned sterling to finance direct shipments of the goods to the United States. In the case of the Blumenthal firm this was done by extending a letter of credit which had been opened on June 30, 1949 in favor of this shipper before the negotiations with plaintiff had begun and which had been allowed to expire unused. When the shippers had drawn against these letters of credit defendant, in late September and October, paid its bankers for the sterling at approximately the new rate after devalution of $2.80 per pound sterling.

Israelachvili had charged the £7,450 telegraphed to South Indian Export Co. Ltd., to plaintiff's account in the amount of $23,992.42 (at the rate of $3.22 per pound sterling). This money was returned to Israelachvili and plaintiff's account credited on September 6 with $23,467.50 (at the then current rate of $3.15).

On September 19, 1949, the pound sterling was devalued by the British government at which time the official rate of exchange became $2.80 per pound sterling. Thereafter, on November 9, 1949, the funds transferred to Blumenthal (for which plaintiff's account had been charged $23,509.22, at the rate of $3.22) were returned to Israelachvili and plaintiff's account credited with $19,199, at the rate of $2.63. The letter of credit in favor of Western India Skin Importers for which plaintiff had been charged $24,150 expired without being used, and several months later plaintiff's account with Israelachvili was credited with $18,330.81, at the rate of $2.46.

Plaintiff claims as damages the difference between the amounts for which he was credited for this sterling on its eventual return to his correspondent and the amount he would have received had he been reimbursed by defendant at the contract rate of $3.48.

■■ Under the terms of the original contract between the parties, plaintiff was entitled to be reimbursed by defendant for the sterling advanced to the shippers only upon receipt by defendant of properly endorsed bills of lading and accompanying documents showing transshipment of the goods to New York, consigned to defendant. Plaintiff has never presented such documents and the goods have never been transshipped, so the condition precedent to payment under the original contract has never been fulfilled and defendant has not thereby been put under any obligation to pay.

Plaintiff, of course, argues that he is excused from compliance with the condition because his failure to transship the merchandise was due to the failure of defendant's shippers to ship the skins to his agent at Djibouti. But this, in turn, was due to the fact that they were never paid in funds legally usable for payment for the goods which were to be shipped, and the failure to furnish legally usable funds is attributable to plaintiff. In 1949, there were in effect exchange control regulations which limited the types of currency legally usable in payment for exports. In general, these regulations were designed to require payment in the currency of the country to which exports were made or, in its equivalent, in sterling or rupees. (Only the question of what sterling was legally available is relevant here, since the contract called for plaintiff to advance sterling.) In India these regulations were issued by the Reserve Bank of India, under the Foreign Exchange Regulation Act, 1947, continued in effect

in both India and Pakistan by virtue of § 18(3) of the Indian Independence Act of 1947, 10 and 11 Geo. 6, c. 30. Applicable regulations are set forth in the Reserve Bank of India Exchange Control Manual (Third Edition) 1949, and A.D.Circular No. 15, issued May 18, 1949, by the Reserve Bank of India, Exchange Control Department, Madras, relating to payments for exports to French Somali Coast. Similar regulations in Pakistan were issued by the State Bank of Pakistan. Its F.E.Circular No. 14, issued May 17, 1949, regulated payments for exports to French Somali Coast.

In accordance with plaintiff's instructions, the Indian or Pakistan shippers were to ship the goods "Djibouti in transit". Under the applicable regulations, the only sterling which could be applied in payment for exports to Djibouti was sterling owned by a resident of French Somali Coast. It is true that, at least in the case of the South Indian Export Co. Ltd., the shipper failed to furnish to the Indian bank involved requested information as to the ultimate destination of the goods. However, revelation of the fact that it was intended to transship the goods at Djibouti for the United States would not have altered the situation. The only sterling which could be applied in payment of shipments to the United States was sterling owned by a resident of one of the countries falling within the same group as the United States. Sterling owned by a resident of Italy was not available to pay for exports either to Djibouti or the United States. Plaintiff had contracted to furnish sterling to pay defendant's shippers. This duty was not fulfilled by furnishing Italian owned sterling which could not be legally applied to payment for the exports in question. It was certainly implied in the contract that the sterling to be furnished would be sterling legally available for the purpose for which it was to be used. Defendant's letter of July 20, 1949, which is Dimond's written statement of the contract, and a document on which plaintiff relies, contained the following second paragraph: "Our shippers will ship the goods to destination from which the Letter of Credit originates and the goods will be transhipped by your shipper direct to the United States." The letter in paragraph 5 clearly contemplates that the plaintiff's shipper thus referred to was to be in East Africa. If plaintiff had supplied sterling owned in the country where his agent to transship the goods was located, there would apparently have been no legal bar to applying that sterling to pay for the shipment. The failure of the arrangement for the financing of these shipments was due, therefore, not to anything done or omitted by defendant or its shippers but to plaintiff's own failure to fulfill his part of the contract. In such a case he cannot transfer to defendant's shoulders the loss he suffered as a result of the miscarriage of the plan.

It is true that it might have been possible to obtain special permission from the Reserve Bank of India to use sterling which was not available under the ordinary regulations. Neither defendant nor its shippers made any effort to secure such permission to use the sterling actually furnished by plaintiff. However, it was plaintiff who undertook to finance the export shipments by furnishing sterling. If he undertook to fulfill this obligation by furnishing funds which could be used only with special permission, it is difficult to see why the obtaining of this permission should not be considered plaintiff's obligation, rather than that of defendant or its shippers. If plaintiff created his own non-performance bar, it was his duty, not the defendant's, to remove it. Furthermore, there has been no evidence as to the likelihood of obtaining such permission. Without in any way considering witness Tembe's letter to counsel for defendant, which is now stricken from the record, it remains a matter of speculation whether it could have been obtained at all, or whether, if it could have been obtained, this could have been done within a reasonable time so as to enable payment to

be made to the shippers and the goods to be shipped. In any event, it would seem that some unusual showing would have had to be made to convince the Indian and Pakistan banks of the need of special permission when the American importer was able and willing to provide legally usable American-owned sterling immediately to finance the shipment.

There remains an argument of plaintiff based on the sentence previously quoted from Dimond's August 8 letter to plaintiff. This, argues plaintiff, should be interpreted as an absolute guarantee that defendant's shippers would ship the goods, and since they failed to do so, defendant should be held liable for any resultant loss to plaintiff. But this undertaking of defendant must be interpreted in its context and in the light of the circumstances under which it was made. There was nothing in the original agreement between the parties which indicated any guarantee by defendant that its shippers would ship the goods in accordance with their contracts. The assumption of responsibility in the August 8 letter is the first mention of any responsibility on the part of defendant for the making of such shipments. It was made because of developments subsequent to the original agreement. Defendant had found it necessary to ask plaintiff to supply sterling to two of its shippers by telegraphic transfer rather than by letter of credit as originally intended. Plaintiff was reluctant to do this because it involved additional risk. The shipper in whose favor the letter of credit had been opened could draw against it only on presentation of bills of lading showing that the merchandise had been shipped. The recipient of funds by telegraphic transfer could get possession of his money before shipping the goods, and possibly in default on his contract he might never ship them. It was as against this danger that plaintiff sought reassurance. To give that reassurance would, under the circumstances, seem to have been the purpose of defendant's statements. The statement that the shippers will deliver the skins is included in the same sentence with the statement that defendant assumes responsibility for the cabling of the sterling. The addition of the statement as to the shippers seems clearly to have been made to clarify what defendant meant by assuming responsibility for the cabling of the money. There is nothing in the circumstances to show that the parties were contemplating a guarantee of shipment even though plaintiff failed to supply proper funds for the payments. The only obligation which defendant assumed was that of protecting plaintiff from the danger that the goods would not be shipped after the shippers had actually received funds which were legally available as payment for the goods. They never received such funds from plaintiff. The loss due to their failure to ship must, therefore, fall upon plaintiff.

Judgment for defendant; costs.